UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:05-CR-7-TS |
| | ) | |
| ANDREW A. BRADSHAW | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion to Suppress [DE 23], filed by the Defendant on February 4, 2005.

### BACKGROUND

The Defendant, Andrew A. Bradshaw, has been charged in a two-count Indictment with possessing with intent to distribute a controlled substance, namely less than fifty kilograms of a mixture or substance containing a detectable amount of marijuana, in violation of 21 U.S.C. § 841(a)(1), and knowingly possessing a firearm in furtherance of and carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c). On February 4, 2005, the Defendant moved the Court to suppress the drugs and guns seized from his vehicle. The Defendant argues that the search of his vehicle violated his Fourth Amendment rights.

On April 15, 2005, the Court conducted an evidentiary hearing on the motion. At the conclusion of the hearing, the Court took the Motion under advisement and the Parties were given additional time to file briefs.

The Defendant submitted a post-hearing Memorandum on May 20, 2005. The government filed its post-hearing Response on June 3, 2005. The Defendant filed a Reply memorandum on June 9, 2005.

### FINDINGS OF FACT

On September 1, 2004, the Romulus Police Department of Romulus, Michigan, received an anonymous tip that an Andrew Aaron Bradshaw of Indiana would be checking into a local hotel to meet a black male from whom he would purchase marijuana. Detective Michael Salandre of the Romulus Police Department contacted the hotel and was informed that a Mr. Bradshaw had recently checked into room 103. The Romulus Police established surveillance of that room and witnessed an African-American male, later identified as Duane Clark, arrive at the hotel and walk directly to room 103 while carrying a large black bag. Clark left the room a short time later with the black bag and reentered his car. Bradshaw then left room 103 with a large bag and entered a light-colored sport utility vehicle (SUV). The Romulus Police observed Bradshaw and Clark talking in the parking lot for a short time before they each drove away from the hotel. The Romulus Police immediately established mobile surveillance of each vehicle.

After observing Clark commit a traffic violation, the Romulus Police initiated a traffic stop. Clark attempted to flee from the police, but heavy traffic prevented his escape. During the officers' initial contact with Clark, the officers could smell a strong odor of marijuana, and a subsequent search revealed that Clark had $6,850 in U.S. currency in his pockets. A search of Clark's vehicle yielded a black bag that contained stems, loose leaves and seeds of suspected marijuana, as well as a passkey for room 103 of the aforementioned hotel and mail addressed to Clark.

Romulus police officers followed Bradshaw's vehicle as well, but they lost sight of the vehicle in heavy traffic. After losing this suspect, the Romulus Police contacted the Indiana State Police in Fort Wayne, Indiana, alerting them to the alleged drug transaction and providing them with information for an all-points bulletin, including: they had conducted surveillance on the suspects, one suspect was already in custody, Bradshaw was a white male, his address in Fort Wayne, Indiana,

his date of birth, he drove a light colored SUV registered in Allen County, and he should be in Indiana around 10:00 p.m. that evening.[1]

At approximately 9:00 p.m. on September 1, 2004, on-duty Indiana State Policeman Joel McLaughlin received a call from Corporal Eric Egbert of the Indiana State Police Command Post. Corporal Egbert informed Trooper McLaughlin of the Romulus Police investigation and that the suspect at large was a young white male driving a light colored SUV with Indiana license plates.

At 9:45 p.m., Trooper McLaughlin observed a sport utility vehicle traveling southbound in the lefthand lane of Interstate 69. The SUV was passing two other passenger vehicles and Trooper McLaughlin believed the SUV to be traveling at about eighty miles per hour. He activated his radar and tracked the vehicle's speed at seventy-eight miles per hour in a sixty-five mile per hour zone. Trooper McLaughlin, in full uniform and driving a marked police car, crossed the median and initiated a traffic stop of the silver Jeep Grand Cherokee, which he pulled over at mile marker 135.

Trooper McLaughlin approached the vehicle, explained the reason for the stop, and asked for the driver's license and registration. He then asked the driver, Bradshaw, where he was coming from. The Defendant replied he was coming from Lake James, Indiana. Trooper McLaughlin asked if there were guns, knives, or illegal drugs in the vehicle, and the Defendant said there were not. Trooper McLaughlin then ordered the Defendant to remain in his vehicle and returned to his police cruiser.

Trooper McLaughlin promptly ran a license check on the stopped motorist and called

---

[1] The Court notes that Romulus, Michigan, is southwest of Detroit and not particularly near the Indiana border. The Record does not disclose where the Romulus Police lost the vehicle under their surveillance or precisely why they called the Indiana State Police in Fort Wayne, apart from the belief that the vehicle was registered in Allen County, Indiana.

Corporal Egbert to ask about the license of the suspect wanted by the Romulus Police.[2] Corporal Egbert stated that they had more information on the suspect, including his name and license number, and it was shortly confirmed that the driver was in fact the suspect wanted by the Romulus Police Department. Corporal Egbert told Trooper McLaughlin that there was reportedly a large amount of drugs in the vehicle and the subject was supposedly armed with a handgun. Additional police units were immediately called for backup, and Trooper McLaughlin waited for these additional forces to arrive. Two officers from the Waterloo Police Department arrived on the scene, and with their backup Trooper McLaughlin returned to the Defendant's vehicle.

Having been told their suspect was armed, Trooper McLaughlin and the other officers ordered the Defendant out of his car at gunpoint. The Defendant complied, dropped his keys outside the window as told and exited the vehicle. Trooper McLaughlin promptly placed the Defendant in handcuffs and read him his *Miranda* rights. As these rights were being read, one of the Waterloo Officers, Officer Aaron Fike, observed a handgun in the Defendant's waistband and immediately removed the weapon. Trooper McLaughlin also conducted a pat-down search of the Defendant and removed a pocketknife from the front pocket of the Defendant's pants. The officers asked the Defendant if he had a permit for the handgun, and he replied that he did and that it was in his wallet in the front of his vehicle.

Trooper McLaughlin approached the driver's door to retrieve the wallet through the open window. As he stood there he noted the odor of marijuana. Trooper McLaughlin asked a second officer to come to the window, who also detected the odor of marijuana. Trooper McLaughlin then retrieved the wallet and found a valid handgun permit inside.

---

[2]The Defendant's Indiana license plates were registered outside of Allen County, which conflicted with the initial information that Corporal Egbert relayed to Trooper McLaughlin from the Romulus Police Department.

Having detected the odor of marijuana, Trooper McLaughlin called for assistance from a drug-detecting canine unit. The Kendalville Police Department possessed the closest available trained dog, and this unit arrived at the scene approximately forty-five minutes after the initial stop of the Defendant. The Kendalville officer and canine commenced a walk around the Defendant's vehicle, and the dog immediately signaled the presence of narcotics by sitting at attention while at the rear of the vehicle.

After this positive signal from the canine, the officers opened the rear door of the Jeep, where they discovered a gym bag lying in the back cargo area. The officers opened the bag and removed five clear plastic bags containing a brownish-green plant-like material which had a strong odor of marijuana. The contraband later tested positive for marijuana. After the officers seized the drugs, they searched the vehicle and discovered a second gun, a loaded Glock 9mm pistol, underneath a compact disc holder on top of the front passenger seat.

After the drugs were discovered, Bradshaw was formally taken into custody. Once in the Dekalb County Jail, the Defendant was issued a traffic citation for speeding. Trooper McLaughlin testified that had the officers not discovered drugs, the Defendant would have been issued a speeding citation and then released.

**DISCUSSION**

The Defendant raises five issues in his Motion to Suppress. First, he argues that the police lacked probable cause to search or seize him because the events of September 1, 2004, commenced with an anonymous tip, and the Indiana officers' reliance on information stemming from this tip violated his Fourth Amendment rights. Second, the Defendant states that Trooper McLaughlin had

no legal justification for asking him about the presence of guns, knives, or illegal drugs in his vehicle, and this inquiry violated his Fourth Amendment rights. Third, the Defendant argues that he was held for an unreasonable period of time before being charged with any crime, and this detention violated his Fourth Amendment rights. Fourth, the Defendant asserts that the officers converted the traffic stop into a drug investigation, and the search of the vehicle violated his Fourth Amendment rights. Fifth, the Defendant challenges the qualifications and methodology of the drug-detecting dog used by the officers, and the Defendant asserts that use of this contraband is barred by the Fourth Amendment exclusionary rule.

### A.     The Anonymous Tip

The Defendant asserts that the initial suspicion and surveillance of his person and his vehicle were based on an anonymous tip, and, as this anonymous tip cannot give officers probable cause for a search and seizure, Trooper McLaughlin's actions violated the Fourth Amendment. The Defendant is correct in saying that an anonymous tip alone cannot provide the basis for probable cause. *Illinois v. Gates*, 462 U.S. 213, 268 (1983). However, it is equally clear that law enforcement officers can corroborate the information received from such sources to obtain probable cause. *See, e.g.*, *United States v. Towns*, 913 F.2d 434 (7th Cir. 1990) (upholding a finding of probable cause after officers received a tip from an anonymous informant and then verified the information provided by observing the suspect and discovering the suspect's name); *United States v. Herrera*, 757 F.2d 144 (7th Cir. 1985) (upholding a determination of probable cause to arrest after drug enforcement officers corroborated an anonymous tip through their own investigation).

Here, the Defendant's argument fails to account for the numerous intervening events that

occurred between the anonymous tip received by the Romulus Police and the bulletin sent to the Indiana State Police upon which Trooper McLaughlin relied. According to the excerpt from the Affidavit of Special Agent Mickey Leadingham of the Bureau of Alcohol, Tobacco, Firearms and Explosives provided by the government, which was not challenged by the Defendant, the Romulus Police Special Investigative Unit established surveillance of their suspects in accord with the tip they received, witnessed the transportation of large bags that corresponded with the tip, identified the Defendant as one of the persons present at this apparent transaction, stopped the other suspect after a traffic violation, and subsequently seized evidence of marijuana and a large amount of cash.

Furthermore, Trooper McLaughlin's own testimony at the suppression hearing, during which he was subject to cross-examination by the Defendant, indicated that he knew that surveillance had been conducted, that the other suspect from this surveillance was in custody, and he was told before conducting the felony arrest that the Defendant was believed to be armed and in possession of large amounts of drugs. For the Defendant to assert that Trooper McLaughlin and his fellow officers were acting on an anonymous tip alone is to ignore a great deal of testimony and evidence without submitting evidence or facts to the contrary.

### B. The Officer's Questions During the Traffic Stop

The Defendant acknowledges that the initial stop of his vehicle was justified by Officer McLaughlin's apprehension of a traffic violation. The Defendant argues, however, that it was inappropriate for Trooper McLaughlin to inquire about the presence of guns, knives, or illegal drugs in the vehicle. The Defendant argues that it is improper for an officer to ask a suspect about drugs or weapons absent a reasonable, articulable basis for asking those questions, citing *United States v.*

*Feliciano*, 45 F.3d 1070, 1072 (7th Cir. 1995). The Defendant's premise is that Trooper McLaughlin had no reasonable basis for asking about drugs or weapons at the time of the initial traffic stop, and the above principle thus limits the officer's available line of questioning.

This argument misses or ignores an important element of the discussion in *Feliciano*, as the Seventh Circuit was there discussing the propriety of stopping or detaining a suspect absent a reasonable, articulable basis. Here, the Defendant had already been stopped on independent, legitimate grounds—Trooper McLaughlin witnessed the Defendant committing a speeding violation and stopped him on that account. Once this initial lawful encounter had ensued, the officer was permitted to ask about drugs or weapons without such questions being considered an independent "seizure" or otherwise illegitimate under the Fourth Amendment. The Seventh Circuit has determined that "because questions are neither searches nor seizures, police need not demonstrate justification for each inquiry," and the proper analysis for such questioning is whether it is reasonable and whether it extends the detention of a suspect to the point of an unreasonable seizure. *United States v. Childs*, 277 F.3d 947, 947 (7th Cir. 2002) (holding that after police have stopped a vehicle for a minor traffic offense, officers were permitted to ask the inhabitants about the presence of drugs without implicating the Fourth Amendment); *see also Lockett v. State*, 747 N.E.2d 539 (Ind. 2001) (holding that the Fourth Amendment does not prohibit police from routinely inquiring about the presence of weapons). Trooper McLaughlin's inquiry as to the presence of guns, knives, or illegal drugs was reasonable, did not extend the traffic stop for an unreasonable period, and thus did not violate the Defendant's Fourth Amendment rights.

**C. The Length of the Detention**

The Defendant next argues that the police exceeded the bounds of the brief, limited investigatory stops proscribed by *Terry v. Ohio*, 392 U.S. 1 (1968), when they held the Defendant in custody for about forty-five minutes between the time of the initial stop and the arrival of the canine unit and ninety minutes before the Defendant was formally given a speeding citation while in jail. The government responds by saying that this was a legitimate *Terry* stop and that the evidence obtained through the course of the investigation justified the continued custody of the Defendant.

Though both Parties treat this encounter as a *Terry* stop, and although Officer McLaughlin did not believe he had arrested the Defendant until after the canine unit had alerted to the presence of illegal drugs, the Court's inquiry is an objective one. The Court will therefore analyze this case to discover at what point, objectively, probable cause existed to arrest the Defendant. *See United States v. Garcia*, 376 F.3d 648, 650 (7th Cir. 2004) (holding that it is the court's role to objectively determine when a suspect has been arrested); *United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004) (same).

The Seventh Circuit recognizes the "collective knowledge doctrine" which, as the Circuit has concisely described, "is designed to allow law enforcement personnel from the same agency, or from different jurisdictions, to rely on the probable cause determinations of one another in order to apprehend specific suspects." *Maltby v. Winston*, 36 F.3d 548, 564 n.26 (7th Cir. 1994). "[S]o long as the facts and circumstances within an agency's collective knowledge . . . warrant a prudent person in believing that the suspect had committed or was committing an offense, an officer of that agency, acting in good-faith reliance on such facts and circumstances, has probable cause to effectuate an arrest." *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (citing *Beck v. Ohio*,

379 U.S. 89, 91 (1964); *United States v. Hensley*, 469 U.S. 221, 232 (1985))

> [T]he police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency. In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause.

*United States v. Valencia*, 913 F.2d 378, 383 (7th Cir. 1990) (internal citations omitted).

Here, the Romulus Police Department, after conducting surveillance of two suspects, witnessing an apparent drug transaction, arresting and detaining one of the suspects, and discovering large amounts of cash and drug evidence on the suspect arrested, certainly possessed probable cause to arrest the second suspect in their investigation. The Romulus Police subsequently lost track of this suspect in heavy traffic—but not before they registered descriptions of the vehicle and suspect as well as the likely identity of the suspect. The Romulus Police Department then relayed this information to the Indiana State Police in the city they believed the suspect to be heading, who in turn directed Trooper McLaughlin to watch for and apprehend the Defendant. Therefore, under the collective knowledge doctrine, once Trooper McLaughlin identified his stopped motorist as the suspect from the dispatch, he had probable cause to arrest the Defendant. After obtaining this information, Trooper McLaughlin (reasonably) physically secured the Defendant, read him his *Miranda* rights, and held him in his squad car until the officers completed their investigation.

At this point, the Defendant was arrested, regardless of how Trooper McLaughlin phrased the terms of the detention. "It does not matter for current purposes what label the officer applied at the scene, analysis under the fourth amendment is objective . . . ." *Jackson*, 377 F.3d at 717; *see also Garcia*, 376 F.3d at 650 (holding that when officers conduct a traffic stop based on probable cause, the Defendant has been arrested and *Terry* is inapplicable).

-10-

The arrest of the Defendant renders inapposite the Defendant's argument that he was subject to lengthy detainment in violation of his rights under *United States v. Place*, 462 U.S. 696 (1983). *Place* applied the *Terry* balancing test (whether (1) the officer "pursued his investigation in a diligent and reasonable manner"; (2) the method of investigation "was likely to confirm or dispel [the officers'] suspicions quickly"; and (3) the detention lasted no longer than was necessary to effectuate the purpose of the stop) to the seizure of a suspect's luggage at an airport while a drug-detecting dog was brought to the scene. As the Seventh Circuit stated in *Garcia*, 376 F.3d at 650, such *Terry* balancing does not apply when a suspect has been arrested. Here, the fact that the officers forced the Defendant to wait a modest amount of time (forty-five minutes from the time of the initial stop) for a canine drug detection unit to arrive to search the vehicle incident to that arrest does not violate any Constitutional rights of the Defendant.

**D.  The Search of the Vehicle**

After this arrest of the Defendant, the police were justified in conducting a simultaneous search of the passenger compartment of Defendant's vehicle incident to that arrest. *See New York v. Belton*, 453 U.S. 454 (1981). Here, after arresting the Defendant the officers seized the Defendant's wallet, the drugs, and the second firearm from the open interior of the Defendant's vehicle.[3] *Belton* grants the officers permission to conduct such a search of the vehicle incident to

---

[3] A Jeep Grand Cherokee does not have a "trunk" separate from the passenger compartment of the vehicle. Thus, the drugs in the "rear compartment" of this open-air interior are not protected from seizure under the heightened protection given to trunks under *Belton*, 453 U.S. at 461 n.4. *See also California v. Acevedo*, 500 U.S. 565 (1991) (holding that when officers have probable cause to search a vehicle as a whole for contraband, they are permitted to search the entirety of the vehicle, including the trunk, if the areas searched could contain the contraband).

arrest, and the evidence is not barred under the Fourth Amendment. *Belton*, 453 U.S. at 460.

The Defendant argues that if the officers did possess probable cause to arrest him or search his vehicle, they should have submitted their evidence to a neutral, detached magistrate to obtain the requisite warrants. *Belton* controls this issue as well. Incident to the arrest of the Defendant, the officers were authorized to conduct a contemporaneous search of the passenger compartment of the Defendant's vehicle without obtaining a search warrant. *Id*.

### E.  The Use and Reliability of the Drug-Detecting Canine

Even though they had in fact already arrested the Defendant, the officers called for a drug-detection unit to confirm their belief—based on the odor emanating from the vehicle—that the vehicle contained marijuana. The Seventh Circuit has repeatedly held that incident to an arrest, officers may bring in drug-detecting dogs and, furthermore, upon a positive signal from these dogs officers may search the vehicle for the signaled contraband. *See United States v. Patterson*, 65 F.3d 68, 70–71 (7th Cir. 1995) (holding that a dog search incident to an arrest for a suspended license was not a violation of the defendant's fourth amendment rights and the drugs seized were admissible against the defendants); *United States v. Fiala*, 929 F.2d 285, 288 (7th Cir. 1991) (holding seized marijuana admissible when officers stopped a vehicle for a traffic violation, arrested the operator, brought in a drug-detecting dog which signaled that there were narcotics present, and the drugs were seized incident to that search). Apart from the probable cause to arrest the Defendant and search his vehicle for drugs imparted by the Romulus Police through the collective knowledge doctrine, the officers obtained probable cause anew through their personal apprehensions of the odor of drugs, the positive indication from the trained canine, and the dishonesty manifested by the Defendant in

providing false information as to the presence of both a gun and a knife on his person. The marijuana seized when the officers searched the rear cargo area for drugs and searched the bag they discovered specifically for drugs is not barred from admission under the Fourth Amendment. *See United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

The Defendant challenges the qualifications of the dog used to alert to the presence of drugs in this case, and he furthermore asserts that the fact that this was a "passive alert" dog (which alerts by sitting at attention) opens the door to obvious police pretext and abuse. With regard to the specific dog used in this instance, the dog's handler, Officer Mike McCann of the Kendallville Police Department, testified at the April 15, 2005, Suppression Hearing as to the qualifications his dog Lanna. Lanna was certified through the North American Police Work Dog Association in July of 2004 (Supp. Hearing Tr. p. 34). As part of its training the dog had to identify the presence of narcotics in a variety of situations and locations and was allowed no more than one mistake (which could be either a "miss" or a false-positive). Prior to this incident Lanna was used in the field on approximately one dozen occasions, and it had one false-positive alert during that time. This false-positive occurred when Lanna alerted to a dresser that had held marijuana in the past, but the drugs had been removed prior to the sniff search. The Court finds that the dog, while in service in the field for only a few months, was certified and adequately reliable for the officers to trust its signal for their probable cause determination.

With regard to the Defendant's attack on law enforcement's employment of "passive alert" signals as a whole, the Defendant does not direct the Court to any authority in support of this

distinction. Neither has the Court's independent inquiry found any basis for rejecting this method of training and animal signaling. Both active-alert and passive-alert dogs must be certified for use in police investigations, as Lanna was in this situation. The Seventh Circuit has stated:

> Typically the dog is trained to signal a find in one of two ways: the aggressive alert or the passive alert. Either style requires a dog with strong search drives that reacts reliably when he detects drugs. The dog trained to alert aggressively tries to contact the scent source (biting, scratching, penetrating, attempting to retrieve), while the dog that alerts passively does not try to contact the scent source but instead performs trained behavior (sitting, looking at the source, sniffing toward the source, looking at the handler).

*United States v. Johnson*, 323 F.3d 566, 567 (7th Cir. 2003) (quoting SANDY BRYSON, POLICE DOG TACTICS 257 (2d ed. 2000)). The Court finds no evidence that passive alerts are being manipulated on the part of police nor does the Court find reason to question the validity of an entire sector of the certified police dogs on the present Record.

### CONCLUSION

For the reasons stated above, the Defendant's Motion to Suppress is DENIED. This case is now scheduled for a Telephonic Conference to set dates for a telephonic final pretrial conference and a jury trial on **July 7, 2005** at **11:30 AM** before Judge Theresa L. Springmann.

SO ORDERED on July 1, 2005.

    s/Theresa L. Springmann
    Theresa L. Springmann, Judge
    UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF INDIANA
    FORT WAYNE DIVISION